**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

|   |   |
|---|---|
| Diana Torres Ríos; Dianeliz Thillet Torres, et al., <br><br> Plaintiff, <br><br> v. <br><br> Dorado Health Center, Inc., et al., <br><br> Defendants. | **Civil No. 22-1129(GMM)** |

<u>**OPINION AND ORDER**</u>

Before the Court is Dorado Health Center Inc. ("Dorado Health") and Dr. Yolisa Suárez-Ortiz's ("Dr. Suárez") (collectively, "Defendants") *Motion Requesting Summary Judgment* and *Statement of Uncontested Material Facts* ("Motion for Summary Judgment"). (Docket No. 29, Exhibits 1 and 2). The Court DENIES in part and GRANTS in part Defendants' Motion for Summary Judgment.

**I.   BACKGROUND**

On March 15, 2022, Diana I. Torres Ríos ("Torres") —Carlos I. Ortiz-Negrón's (R.I.P.) common law wife— and C.O.T —son of the deceased— filed a Complaint against Dorado Health; Dr. Suárez, her husband and their conjugal partnership; Corporation A, B and C as fictious names for the corporation in charge on the administration and the operations of Manatí Medical Center's ("Hospital")

Civil No. 22-1129(GMM)
Page -2-

Emergency Room ("ER") and unknown Insurance Companies A through H. (Docket No. 1). Plaintiffs' claims are brought pursuant to the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd et seq. ("EMTALA"), based on failure to provide appropriate screening and failure to stabilize, as defined under the statute, and under Puerto Rico's general tort statute, for negligent deviations from the applicable standard of medical care in the Hospital's ER. Id. at 2. On June 29, 2022, Dianeliz Thillet Torres, Torres' daughter, filed a Complaint, against the same Defendants. *See* No. 22-cv-01313. On September 2, 2022, the Court consolidated both cases. (Docket No. 22).

On December 29, 2022, the Defendants filed a Motion for Summary Judgment (Docket No. 29). Plaintiffs sought, and the Court granted, an extension of time to respond to Defendants' Motion for Summary Judgment. (Docket No. 32). On February 02, 2023, the Plaintiffs filed a *Memorandum of Law Opposing Defendants' Motion for Summary Judgment* and *Opposing Statement of Material Facts with Respect to Statement of Uncontested Facts*. (Docket Nos. 34 and 35).

II.   SUMMARY JUDGMENT STANDARD

Civil No. 22-1129(GMM)
Page -3-

A.   Fed. R. Civ. P. 56

Fed. R. Civ. P. 56 governs motions for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute in a material fact "if the evidence 'is such that a reasonable jury could resolve the point in favor of the non-moving party.'" Taite v. Bridgewater State University, Board of Trustees, 999 F.3d 86, 93 (1st Cir. 2021) (quoting Ellis v. Fidelity Management Trust Company, 883 F.3d 1, 7 (1st Cir. 2018)). In turn, a fact is material "if it 'has the potential of affecting the outcome of the case.'" Id. (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)). In making its determination, the Court will look to "the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. . ." Johnson v. University of Puerto Rico, 714 F.3d 48, 52 (1st Cir. 2013) (citing Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008)).

The movant has "the initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact' with definite and competent evidence." Arroyo-Ruiz v. Triple-S Management Group, 258 F.Supp.3d 240, 245 (D.P.R. 2017) (quoting Campos v. Van Ness, 711 F.3d 243, 247-48 (1st Cir. 2013)). "Once the moving party has properly supported [its] motion for summary judgment, the burden

Civil No. 22-1129(GMM)
Page -4-

shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)). Indeed, the non-movant is required to "present definite, competent evidence to rebut the motion." Martínez-Rodríguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).

Further, the Court must "draw [] all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation." Smith v. Jenkins, 732 F.3d 51, 76 (1st Cir. 2013). The Court must also refrain from engaging in assessing the credibility or weight of the evidence presented. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). Facts which are properly supported "shall be deemed admitted unless properly controverted" and the Court is free to ignore such facts that are not properly supported. Local Civ. R. 56(e); Rodríguez-Severino v. UTC Aerospace Sys., No. 20-1901, 2022 WL 15234457, at *5 (1st Cir. Oct. 27, 2022).

B.   Local Civ. R. 56

Civil No. 22-1129(GMM)
Page -5-

Local Civ. R. 56 also controls motions for summary judgment. *See* Local Civ. R. 56. In sum, it requires from the non-movant to "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Local Civ. R. 56(c). If the fact is not admitted, "the opposing statement shall support each denial or qualification by a record citation. . ." <u>Id.</u> In its opposing statement, the non-movant can include additional facts supported by record citations. *See* <u>Id.</u> In turn, the movant "shall submit with its reply a separate, short, and concise statement of material facts, which shall be limited to any additional fact submitted by the opposing party." Local Civ. R. 56(d). In its statement, the movant shall admit, deny, or qualify those additional facts. *See* <u>Id.</u> Any denial and qualification that the movant raises must be supported by a record citation. *See* <u>Id</u>.

Failure to comply with Local Rule 56(c) gives the Court the ability to accept a party's proposed facts as stated. *See* <u>López-Hernández v. Terumo Puerto Rico LLC</u>, 64 F.4th 22, 26 (1st Cir. 2023); *see also* <u>Natal Pérez v. Oriental Bank & Trust</u>, 291 F.Supp.3d 215, 219 (D.P.R. 2018) ("If a party improperly controverts the facts, Local Rule 56 allows the Court to treat the opposing party's facts as uncontroverted."). Litigants ignore Local Rule 56(c) at their peril. *See* <u>López-Hernández</u>, 64 F.4th at 26.

### III. FINDINGS OF FACT

Civil No. 22-1129(GMM)
Page -6-

The Court examined Defendants' *Statement of Uncontested Material Facts* (Docket No. 29, Exhibit 2) and Plaintiffs' *Opposing Statement of Material Facts with Respect to Statement of Uncontested Facts*. (Docket No. 35). First, the Court only credits material facts properly supported by a record citation. Second, the Court reads the Complaint, in the light most favorable to the Plaintiffs and resolves any ambiguities in their favor, *see* Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 17 (1st Cir. 2011). Accordingly, the Court makes the following findings of fact which center on Plaintiffs' claim under EMTALA.

1. The Hospital is subject to the provisions of EMTALA (Docket Nos. 29, Exhibit 2 at 1; and 35 at 2 ¶ 1).

2. On July 25, 2021, Mr. Ortiz was brought to the Hospital's ER at 5:48 p.m. (Docket No. 29, Exhibit 3 at 20).

3. At 6:56 p.m. Mr. Ortiz was triaged by Nurse Crystal Arroyo Torres ("Nurse Arroyo"), who documented left leg pain as Mr. Ortiz's chief complaint. (Docket Nos. 29, Exhibit 2 at 1-2, Exhibit 3 at 20-22; and 35 at 4 ¶ 2).

4. Nurse Arroyo documented that since the morning of July 25, 2021, Mr. Ortiz reported discomfort and petechiae in the lower left extremity. Areas of redness were observed in the lower left extremity. Mr. Ortiz was accompanied by his son and daughter. Also, it is documented that Mr. Ortiz had been seen at 'Hospital de Morovis' within the past 24 hours. (Docket Nos. 29, Exhibit 3 at 20; and 35 at 2 ¶ 3).

5. The medical record shows that vital signs were taken and reflected: Blood pressure: 132/78; Pulse rate: 79; Respiratory rate: 18; and temperature 37.6 C. Past medical history of hypertension and

hypothyroidism was documented. (Docket No. 29, Exhibit 3 at 21-22).

6.  Dr. Suárez evaluated Mr. Ortiz at 7:13 p.m. and documented that he is a 54-year-old male that came to the ER with left leg edema and pain since morning of that day. She noted that Mr. Ortiz denied chest pain, shortness of breath (SOB) or fever. (Docket Nos. 29, Exhibit 3 at 3; and 35 at 3 ¶ 5).

7.  Dr. Suárez's physical examination of Mr. Ortiz, as documented, reflected ecchymosis (bruising), a 3+ edema on the lower extremity exam, specifically, on the hip pelvic exam, and swelling in the upper leg and knee. She noted "denies Homan's Sign." (Docket Nos. 29, Exhibit 3 at 4; and 35 at 3 ¶ 6 and 7).

8.  Dr. Suárez concluded that the chest, respiratory and cardiovascular exams were normal, and that Mr. Ortiz was stable, alert, and without acute distress or palpitations. (Docket Nos. 29, Exhibit 3 at 4; and 35 at 3 ¶ 7).

9.  Dr. Suárez ordered a duplex Deep Venous Thrombosis (DVT), as well as I.V. fluids, medications (unspecified), X-Rays, and lab tests. Per the record, Mr. Ortiz was advised about the plan and verbalized understanding. (Docket No. 29, Exhibit 3 at 4).

10. The medical record reflects that at 7:18 p.m., Dr. Suárez ordered lab tests, including an order for "STAT" (Urgent) blood work to determine D-Dimer level, and ordered for a "STAT" doppler ultrasound of the left leg to evaluate for DVT. (Docket Nog. 29, Exhibit 3 at 40-42, 45; and 35 at 7 ¶ 6).

11. Dr. Suárez completed her medical note at 7:27 p.m. (Docket Nos. 29, Exhibit 3 at 5; and 35 at 7 ¶ 7).

12. At some point on the night of July 25, 2021, or in the morning of July 26, 2021, Dr. Suárez completed her shift in the ER and Belissa A. López Pena, MD ("Dr. López"), assumed care of Mr. Ortiz. (Docket Nos. 29, Exhibit 3 at 6; and 35 at 7 ¶ 9).

Civil No. 22-1129(GMM)
Page -8-

13. Between 11:52 p.m. of July 25, 2021, and 12:03 a.m.
    of July 26, 2021, blood samples were drawn for lab
    tests: Basic Metabolic Panel (BMP), Complete Blood
    Cells (CBC) and coagulation (Partial Thromboplastin
    Time, D-Dimer, and Prothrombin Time INR). (Docket
    Nos. 29, Exhibit 3 at 27 and 40-45; and 35 at 4 ¶
    10).

14. At 12:02 a.m., Nurse Christian Resto Rosario ("Nurse
    Resto"), documented that Mr. Ortiz was awake, alert,
    appropriate and calm. He also noted that the patient
    had saline lock as IV solution. (Docket Nos. 29,
    Exhibit 3 at 27; and 35 at 4 ¶ 11).

15. At 1:16 a.m. of July 26, 2021, a panic value call
    was received related to the D-Dimer result, which
    was notified to Dr. López at 1:23 a.m. The D-Dimer
    level was 9.63 mg/L (Normal <0.59 mg/L). (Docket
    Nos. 29, Exhibit 3 at 25; and 35 at 4 ¶ 12).

16. Dr. López ordered that the D-Dimer test be repeated.
    The record does not reflect additional orders.
    (Docket Nos. 29, Exhibit 3 at 12; 35 at 8 ¶ 12).

17. At 3:21 a.m., Nurse Sandra Rivera Nuñez ("Nurse
    Rivera"), assessed Mr. Ortiz and the disposition was
    to continue with previous orders and to refer to new
    medical orders. (Docket Nos. 29, Exhibit 3 at 26;
    and 35 at 4 ¶ 13).

18. At 6:35 a.m. Nurse Stephany Domínguez Murphy ("Nurse
    Dominguez") entered a note stating that Mr. Ortiz
    was not in his care unit, and that when looking for
    him she observed him pale and sweaty on the floor of
    the corridor. (Docket No. 35, Exhibit 1 at 3).

19. Mr. Ortiz was transferred on a stretcher to the
    cardiology area, a cardiac monitor and nasal cannula
    were placed. The vitals were: Blood Pressure: 96/69,
    Pulse: 140, and Dextrose: 121 MG/DL. (Docket No. 35,
    Exhibit 1 at 3).

20. Nurse Domínguez documented that Dr. López was
    informed at 6:35 a.m. of the event, vital signs, and
    symptoms. Also, that Dr. López immediately evaluated

Mr. Ortiz, and that therapy staff was notified to assess him. (Docket No. 35, Exhibit 1 at 3).

21. At 6:43 a.m., Nurse Domínguez placed a cardiac monitor on Mr. Ortiz and a urinary catheter size 16. She also documented that the color of Mr. Ortiz's urine was bright yellow, the odor was normal, and the drainage was 100 ml. (Docket Nos. 29, Exhibit 3 at 24; and 35, Exhibit 1 at 3).

22. Nurse Domínguez registered that Mr. Ortiz was channeled in the left hand with Angio 18, that Levophed 4 mg was administered at 8 mL/hr, that a urinary catheter (Foley catheter) was placed, and that Mr. Ortiz was kept under observation. (Docket Nos. 29, Exhibit 3 at 61; and 35, Exhibit 1 at 3).

23. At 6:45 a.m., Dr. López ordered a "STAT" CT Angiogram of the chest with contrast to evaluate for possible pulmonary embolism. (Docket Nos. 29, Exhibit 3 at 49; and 35, Exhibit 1 at 3).

24. At 7:30 a.m., Nurse Domínguez documented that, when she was doing her round, she observed that the cardiac monitor showed "No electric activity" (Asystole), that Mr. Ortiz had no pulse and was not breathing, that Code Green was then activated, and that CPR and ACLS resuscitation were initiated. (Docket No. 35, Exhibit 1 at 3).

25. At 7:43 a.m. Dr. López entered a note documenting that she had been called by registered nurse due to Mr. Ortiz's sudden chest pain and fall after getting up to use the bathroom. She noted that before that event Mr. Ortiz had been comfortable and hemodynamically stable with normal vital signs. Mr. Ortiz had been taken to CPR room for evaluation. Mr. Ortiz complained of chest pain and was diaphoretic with increased respiratory rate followed by sudden hypotension and use of accessory respiratory muscles. I.V. fluid resuscitation was initiated, and labs ordered. (Docket Nos. 29, Exhibit 3 at 36; and 35, Exhibit 1 at 3-4).

26. At 7:45 a.m., Mr. Ortiz was intubated and placed on mechanical ventilation. (Docket Nos. 29, Exhibit 3 at 37; and 35, Exhibit 1 at 4).

27. At 7:56 a.m., Dr. López entered a note indicating that, in her evaluation, Mr. Ortiz presented signs and symptoms of pulmonary embolism. She also documented that Mr. Ortiz suffered sudden cardiorespiratory arrest and ACLS started immediately. Compression and manual respirator ventilation with O2 100% in 30:2 cycles on curse with Mr. Ortiz connected to cardiac monitor. Endotracheal intubation with tube 7.5 achieved on first attempt. After 5 minutes of aggressive resuscitation patient did respond with spontaneous accelerated regular rhythm as per cardiac monitor. Mr. Ortiz was connected to microvascular decompression (MVD). (Docket Nos. 29, Exhibit 3 at 37; and 35 at 5 ¶ 16).

28. At 8:11 a.m., Nurse Domínguez documented that Mr. Ortiz regained a pulse and that CPR and ACLS protocol were stopped. (Docket No. 35, Exhibit 1 at 4).

29. At 8:22 a.m., Dr. López entered a note documenting that Mr. Ortiz had no palpable pulses and that after 10 minutes of aggressive resuscitation, responded with spontaneous accelerated regular rhythm as per cardiac monitor. Mr. Ortiz was connected to microvascular decompression (MVD). (Docket Nos. 29, Exhibit 3 at 38; and 35 at 5 ¶ 17).

30. At 8:27 a.m., the 13.92 mg/L "critical value verified by repeat determination" (D-Dimer results) taken at 1:16 a.m., were notified to RN K VICENS. (Docket Nos. 29, Exhibit 3 at 12; and 35 at 10 ¶ 24).

31. At that same time, Nurse Domínguez documented that, while performing her round, she observed that the cardiac monitor showed asystole, that Mr. Ortiz had no palpable pulse and was not breathing. In addition, that Code Green was activated, and that CPR and ACLS resuscitation were again started. (Docket No. 35, Exhibit 1 at 4).

Civil No. 22-1129(GMM)
Page -11-

32. At 9:11 a.m., Dr. López entered another note
    indicating that she attended a Code Green call and
    arrived at Mr. Ortiz's room to an active ongoing CPR
    scenario. She noted, among other things, that after
    40 minutes of aggressive resuscitation, Mr. Ortiz
    did not respond and he was pronounced dead at 9:02
    a.m. (Docket Nos. 29, Exhibit 3 at 39; and 35,
    Exhibit 1 at 4).

### IV.  APPLICABLE LAW AND DISCUSSION

A.  Emergency Medical Treatment and Active Labor Act ("EMTALA")

The Defendants' main assertion is that Plaintiffs' Complaint falls outside EMTALA's scope. Therefore, the Court now examines the applicable statutory provisions. The First Circuit interpreted EMTALA, for the first time, in the case of Correa v. Hospital San Francisco, 69 F.3d 1184 (1st Cir. 1995). The Court recalled the statute's congressional history:

> [a]s health-care costs spiraled upward, and third-party payments assumed increased importance, Congress became concerned 'about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance.' H.R. Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 42, 605. Congress enacted EMTALA to allay this concern.

Id. at 1189. Therefore, EMTALA was conceived for a specific and limited issue: the widespread worry that uninsured and impoverished patients were being "dumped" onto other hospitals, and/or discharged by hospitals who did not wish to treat them. *See* Correa, 69 F.3d at 1189. EMTALA is not to be treated like a federal malpractice statute. Correa, 69 F.3d at 1192-93.

Civil No. 22-1129(GMM)
Page -12-

1.  <u>Prima Facie Case</u>

To establish an EMTALA violation, a plaintiff must show that (1) the hospital is an EMTALA covered participating hospital that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either: (a) did not afford the patient an appropriate screening to determine if she had an emergency medical condition; or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition. *See* <u>Correa</u>, 69 F.3d at 1190 (*citing* <u>Miller v. Medical Center of S.W. Louisiana</u>, 22 F.3d 626, 628 (5th Cir. 1994); <u>Stevison by Collins v. Enid Health Sys., Inc.,</u> 920 F.2d 710, 712 (10th Cir.1990)). In other words, a plaintiff can bring a cause of action under either the screening or stabilization provisions of EMTALA, or both.

Plaintiffs' Complaint centers on an alleged failure to provide appropriate screening and stabilization. As to the first and second prongs, it is undisputed that the Hospital is a participating facility under EMTALA, and that Mr. Ortiz went there to seek medical treatment. The Court now turns to the third prong, whether the Hospital failed to provide appropriate screening and whether there was a duty to stabilize under the statute.

Civil No. 22-1129(GMM)
Page -13-

   a. <u>Appropriate Screening</u>

 First, the Court addresses the allegations pertaining to the screening. As stated, EMTALA requires an appropriate medical screening, but does not explain what constitutes one. However, the First Circuit defined "appropriate medical screening" and specifically stated:

> [a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides the level of screening uniformly to all those who present substantially similar complaints. . .[Thus] a refusal to follow regular screening procedures in a particular instance contravenes the statute, but faulty screenings in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute.

<u>Correa</u>, 69 F.3d at 1192-93. "The essence of the requirement is that there be some screening procedure, and that it be administered even-handedly." <u>Id.</u> at 1192. Therefore, under EMTALA, patients are entitled to be treated as other similarly situated patients within the hospital's capabilities, but not to non-negligent treatment in all circumstances.

 It is up to each hospital itself to determine what its screening procedures will be, and having done so, it must apply them alike to all patients. *See* <u>Del Carmen Guadalupe v. Negron</u>, 299 F.3d 15, 21 (1st Cir. 2002) (noting that EMTALA only requires "an appropriate medical screening examination within the

capability of the hospital's emergency department", which is "a standard which will of necessity be individualized for each hospital, since hospital emergency departments have varying capabilities.") (internal quotations omitted). In other words, a hospital's screening protocols play a central role in its EMTALA screening duty. "Whether a hospital's existing screening protocol was followed in a circumstance where triggering symptoms were identified by hospital emergency room staff is thus a touchstone in gauging uniform treatment." Cruz-Vazquez v. Mennonite General Hosp., Inc., 717 F.3d 63, 70 (1st Cir. 2013).

The First Circuit has also stated that an egregious and unjustified delay in attending a patient can amount to an effective denial of a screening examination. Correa, 69 F.3d at 1193. In Correa, the First Circuit found that defendants failed to provide appropriate screening to the patient, because they merely assigned her a number upon being told she was experiencing chest pains; such act was so egregious and lacking in justification that it amounted to an effective denial of a screening examination in violation of EMTALA. Id. 69 F.3d at 1188. Therefore, a complete failure to attend to a patient who presents a condition that practically everyone knows may indicate an immediate and acute threat to life (i.e., severe head and chest pain with a high blood pressure) can constitute a denial of an appropriate medical screening examination under section 1395dd(a). See Marrero v.

Hosp. Hermanos Melendez, 253 F.Supp.2d 179 (D.P.R. 2003). In

Marrero, the patient, who suffered from diabetes and hypertension,

went to the hospital complaining of a severe headache and chest

pain after being referred there for high blood pressure. After an

hour and a half wait, the patient was seen by a nurse and two

doctors, who performed only one CBC laboratory and prescribed an

over-the-counter medicine for the patient's headache before

discharging him. A few days later, the patient died of cerebral

edema. On the hospital's motion for summary judgment, the court

held that plaintiffs had authority to pursue an action under

EMTALA. The hospital was not entitled to summary judgment on the

duty to screen claim because there was a question of fact whether

the appropriate tests and evaluations to screen the patient's head

and chest pain conditions were performed; the record showed that

only one CBC was performed, even though a doctor had ordered a

second CBC and an EKG.

As seen, EMTALA's interpretation has vastly broadened since

its passage. The scope and depth of its obligations on issues

ranging from the nature of the screening obligation to

stabilization protections has expanded. However, it must be made

clear that "EMTALA does not create a cause of action for medical

malpractice." Correa, 69 F.3d at 1192-93. Neither does it create

a cause of action for faulty screening. "Faulty screening, in a

particular case, as opposed to disparate screening or refusing to

Civil No. 22-1129(GMM)
Page -16-

screen at all, does not contravene the statute." Correa, 69 F.3d
at 1192-93 (*citing* Brooks v. Md. Gen. Hosp., 996 F.2d 708, 711
(4th Cir. 1993)). Therefore, EMTALA cases must be examined with
this understanding.

The Defendants argue that the Hospital's failure "to
correctly assess and/or diagnose and/or treat Mr. Ortiz, do not
give rise to a valid cause of action under EMTALA. Rather, they
are, at most, a medical malpractice claims actionable under the
Puerto Rico tort statutes and, as such, should be pursued in state
courts." (Docket No. 29, Exhibit 1 at 10). Plaintiffs' allegations,
however, are that "the attending physician ordered certain
screening, but it was never done in part and done so late that it
was tantamount to no screening at all to appropriately identify
critical medical conditions." (Docket No. 34 at 21). They argue
that:

> [Mr. Ortiz] arrived at the Hospital with symptomatic
> conditions which called for screening for pulmonary
> embolism (PE) and deep vein thrombosis (DVT), which is
> evidenced and supported by the fact that Dr. Suarez,
> the initial attending physician at the Hospital's [ER],
> ordered "[STAT]" and "Urgent" tests to be done designed
> to either confirm or rule out these conditions. The
> medical record is clear regarding, and none of the
> Defendants contest, the fact that the "Urgent" blood
> work wasn't even drawn until over 4.5 hours after the
> "Urgent" order was placed and that the "[STAT]" doppler
> ultrasound was never done.

Id. at 20-21. Therefore, Plaintiffs claim an action under EMTALA
for failure to provide appropriate screening reasonably calculated

to identify the critical medical conditions afflicting Mr. Ortiz or, at the very least, Mr. Ortiz's screening was so delayed or paltry that it amounted to no screening at all.

These are the facts. Mr. Ortiz arrived at the ER on July 25, 2021, at 5:48 p.m. He reported discomfort in the lower left extremity, and areas of redness were observed by Nurse Arroyo in his lower left extremity. At 6:56 a.m. —one hour and seven minutes later—, Nurse Arroyo took Mr. Ortiz's vital signs. At 7:13 p.m. — 16 minutes later— Dr. Suárez's conducted a physical examination. Immediately after, at 7:18 p.m., Dr. Suárez ordered "STAT" blood work to determine D-Dimer level and "STAT" doppler ultrasound of the left leg to evaluate for DVT.

Between 11:52 p.m. of July 25 and 12:03 a.m. of July 26 — approximately 4.5 hours to 5 hours after— the blood samples were drawn. Approximately an hour later, at 1:16 a.m., a panic value call was received related to the D-Dimer result. At 1:23 a.m., Dr. López was notified, and she then ordered a repetition of the D-Dimer level test.

The results of the bloodwork were notified at 8:27 a.m., nearly, 7 hours later. At the time, Mr. Ortiz had already suffered cardiorespiratory arrest and symptoms of a pulmonary embolism.

Approximately, 13 hours transpired from Dr. Suarez's initial order until the Hospital obtained the lab results. As to the "STAT"

doppler ultrasound of the left leg to evaluate for DVT, it was never performed. Mr. Ortiz was pronounced dead at 9:02 a.m.

Against this backdrop, the Court finds there are genuine issues of material fact as to whether the Hospital provided an appropriate screening that meets the EMTALA threshold, i.e., at this stage, the Court is unable to determine that the delay at hand is egregious and unjustified amounting to an effective denial of a screening examination. *See* Correa, 69 F.3d at 1193. Moreover, neither party has presented the Hospital's protocols or policies. Therefore, the Court cannot determine whether the Hospital followed them, and whether it failed to perform the appropriate tests and treatment. It remains to be seen whether the delay in this case is tantamount to determining that the Hospital failed to provide a level of screening on par with other patients who presented substantially similar complaints or in compliance with the Hospital's procedures.

In the end, it will be up to the jury to decide whether the Hospital failed to screen Mr. Ortiz as required by EMTALA, whether the Hospital adhered to its own standard procedures to screen Mr. Ortiz as it would have done with any other patient in like circumstances. Again, the summary judgment record is insufficient to conclude that the Hospital did not violate EMTALA, as a matter of law. Therefore, Defendants' request for summary judgment on this ground must be DENIED.

Civil No. 22-1129(GMM)
Page -19-

   b.   <u>Duty to Stabilize an Emergency Medical Condition</u>

   The Court now examines the allegations surrounding the stabilization duty which is independent from the duty to screen. The statute defines the term "to stabilize" as the duty the participating hospital has "to provide such medical treatment of the condition as may be necessary to assure, within reasonable probability, that no material deterioration of the condition is likely to result from the transfer of the individual." 42 U.S.C. § 1395dd (e)(3)(A). The First Circuit has determined that the duty to stabilize under EMTALA "does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, <u>but merely prescribes</u> <u>a precondition the hospital must satisfy before it may undertake</u> <u>to transfer the patient to another hospital</u>." *See* <u>Fraticelli-Torres v. Hosp. Hermanos</u>, 300 Fed.Appx. 1, 4 (1st Cir. 2008) (emphasis added); <u>Alvarez-Torres v. Ryder Memorial Hosp</u>, 582 F.3d 47 (1st Cir. 2009).  Thus, a hospital cannot violate the duty to stabilize unless it transfers a patient, as that procedure is defined in EMTALA. *See* <u>Correa</u>, 69 F.3d at 1190 (holding that to establish a violation of the duty to stabilize, the plaintiff must prove, inter alia, that the hospital "bade farewell" to the patient).

   The record does not support that Defendants violated the stabilization provision. Mr. Ortiz was never transferred. The

statute defines 'transfer' as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital." 42 U.S.C. § 1395dd(e). A hospital violates its duty to stabilize under EMTALA when it fails to stabilize a patient before transferring or discharging him or her. *See* Correa, 69 F.3d at 1190. Mr. Ortiz never left the hospital and there was no intention or expressed directive to transfer him to another hospital. Because no transfer occurred, Plaintiffs have not established a stabilization claim under EMTALA.

B.   The Puerto Rico Medical Malpractice Claims

A federal court exercising original jurisdiction may assert supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). District courts possess considerable discretion in determining whether to exercise this authority, considering factors such as judicial economy, convenience, fairness to litigants, and comity. *See* Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 191 (1st Cir. 2011). Plaintiffs' medical malpractice claims are "so related" to their surviving EMTALA claim.

**Civil No. 22-1129(GMM)**
**Page -21-**

Accordingly, the Court will retain supplemental jurisdiction over the Puerto Rico law causes of action.

## V.   CONCLUSION

The Defendants' *Motion for Summary Judgment* is GRANTED IN PART AND DENIED IN PART. Plaintiffs' stabilization claims under EMTALA are dismissed with prejudice. Partial Judgment shall be entered accordingly. The EMTALA screening claim and the state-law medical malpractice claims against the Hospital and Dr. Suárez remain.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this, August 4, 2023.


s/Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE